**Gerald GRIGGS–RYAN,**
**Plaintiff, Appellant,**

v.

**Beulah SMITH, Defendant, Appellee.**

**Gerald GRIGGS–RYAN,**
**Plaintiff, Appellant,**

v.

**Richard CONNELLY, et al.,**
**Defendants, Appellees.**

**Nos. 89–2204, 90–1004.**

United States Court of Appeals,
First Circuit.

Heard May 7, 1990.

Decided June 8, 1990.

Thomas Van Houten, with whom Wood & Van Houten was on brief, for plaintiff, appellant.

John H. O'Neil, Jr. and Smith & Elliott, P.A. on brief, for defendant, appellee Beulah Smith.

John M.R. Paterson, with whom Neal F. Pratt and Bernstein, Shur, Sawyer & Nelson were on brief, for defendants, appellees Richard Connelly and Town of Wells, Maine.

Before TORRUELLA, SELYA and CYR, Circuit Judges.

SELYA, Circuit Judge.

Reaching out to touch someone, plaintiff-appellant Gerald Griggs–Ryan filed two related civil actions in the United States District Court for the District of Maine. Suing his landlady, Beulah Smith, plaintiff alleged that she unlawfully intercepted and disclosed the contents of a telephone conversation in which he participated.[1] Suing the Town of Wells and Richard Connelly, a detective in the Wells Police Department, plaintiff alleged that Connelly violated his rights by disseminating the contents of the telephone conversation recorded by Smith. He also alleged that the municipality was liable for Connelly's malefaction under principles of *respondeat superior.*

Eventually all parties moved for summary judgment. The district court granted defendants' motions. *See Griggs–Ryan v.*

---

1. Plaintiff claimed that defendants violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2521 (1982 & Supp. V 1987) (Title III). In pertinent part, Title III, subject to certain exceptions, proscribes the intentional and nonconsensual interception or disclosure of any "wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a), (c). And it affords a civil remedy:

any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate.

18 U.S.C. § 2520(a). Title III also specifies rules for computing damages. *See* 18 U.S.C. § 2520(c).

*Connelly,* 727 F.Supp. 683 (D.Me.1989).[2] We affirm.

## I. BACKGROUND

As necessitated by the posture of the appeals, we recount the properly documented facts in the mien most favorable to the summary judgment loser. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990); *see also* Fed.R.Civ.P. 56(c).

Plaintiff was a tenant at a campground which Smith operated in Wells. The individual units did not have telephones, but lodgers were allowed to use the landlady's telephone. During the summer of 1987, Smith was plagued by obscene calls. On the police department's advice, she began to record incoming calls through her answering machine. Because she suspected that plaintiff's friend, Paul Jackson, was responsible for the offensive overtures, Smith informed plaintiff on a number of occasions that all calls to her home were being recorded. She hoped, of course, that plaintiff would relay the message to Jackson.

On September 14, 1987, Smith answered the telephone in her bedroom. The caller identified himself as "Richard Kierstead" and asked to speak with plaintiff. Smith held the line open to maintain the connection while her daughter went to fetch plaintiff. When Griggs–Ryan picked up the office extension, Smith started to cradle her instrument. Overhearing the caller say, "Hi, it's Paul, she thinks its Kierstead," and believing the voice to be Paul Jackson's, Smith changed her mind. She did not hang up but instead listened to and recorded the ensuing discussion.

As a result of the eavesdropping, Smith came to suspect that the overheard conversation concerned a drug transaction. She immediately contacted the authorities. At police headquarters, she played the tape for defendant Connelly. Sharing Smith's suspicions, the detective revealed the conversation's contents to the district attorney and to a local magistrate (known colloquially as a "Complaint Justice"). The magistrate issued a warrant to search plaintiff's abode and the Wells police executed it, seizing marijuana. Griggs–Ryan was arrested and charged with trafficking.

A suppression hearing was held in the state superior court. Smith testified about what she told Griggs–Ryan concerning her recording practice. The judge found that plaintiff was "unaware" that Smith was listening to, or recording, the September 14 conversation, and ruled that Smith's interception of the conversation was therefore inadmissible under Maine law. On September 28, 1989, the judge suppressed the fruits of the search.

In the meantime, plaintiff had begun the instant suits in federal court. After discovery was completed, cross motions were filed under Fed.R.Civ.P. 56. For their part, defendants argued that plaintiff, by electing to talk to Jackson after Smith's warning that all incoming calls were being recorded, effectively acquiesced in the interception.[3]

The district court concluded that the landlady's actions were not proscribed by federal law because "Smith informed Plaintiff on more than one occasion that she was recording *all* incoming calls" and that there was "no evidence that Smith qualified her statements to Plaintiff" on the matter. 727 F.Supp. at 685. Thus, the district court held that "Plaintiff's receiv-

**2.** The district court wrote a separate memorandum of decision in the suit against Smith. That rescript, while unpublished, tracks the published opinion in *Griggs–Ryan v. Connelly* in all relevant aspects. Thus, we do not cite separately to it.

**3.** We use the term "interception" provisionally. Defendants dispute whether Smith's actions comprised an interception at all. Because we believe that the instant appeals are resolvable

on other grounds, we need not decide whether Smith's recording of a lodger's call received on her own household line constituted an interception for purposes of Title III. *See, e.g., Lizza v. Lizza,* 631 F.Supp. 529, 532–33 (E.D.N.Y.1986) (reviewing divided authorities on question of Title III's applicability to a person's decision "to record conversations on his own residence's telephone").

ing of a telephone call inside of Smith's home, when considered in light of the warning he received, manifests implied consent" sufficient to trigger the prior consent exception to Title III.[4] *Id.* at 687.

## II. THE SUMMARY JUDGMENT STANDARD

 Summary judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Our review of such a disposition is plenary. *See Garside,* 895 F.2d at 48; *Quaker State Oil Refining Corp. v. Garrity Oil Co.,* 884 F.2d 1510, 1513 (1st Cir.1989). Like the district court, we must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor. *See Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir.1989); *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir. 1989).

We recently delineated the yardstick by which a summary judgment thrust must be measured:

> The movant must put the ball in play, averring "an absence of evidence to support the nonmoving party's case." The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both "genuine" and "material." A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Put another way, a "genuine" issue exists if there is "sufficient evidence supporting the claimed factual dispute" to require a choice between "the parties' differing versions of the truth at trial." A "material" issue is one that "affect[s] the outcome of the suit," that is, an issue which, perforce, "need[s] to be resolved before the related legal issues can be decided." . . . .

On issues where the nonmovants bear the burden of proof ..., they must reliably demonstrate that specific facts sufficient to create an authentic dispute exist.

*Garside,* 895 F.2d at 48 (citing and quoting, *inter alia, Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), and *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511; other citations omitted). The happenstance that all parties seek summary judgment neither alters the yardstick nor empowers the trial court to resolve authentic disputes anent material facts. To the contrary, the court must evaluate each motion separately, being careful to draw inferences against each movant in turn. *See Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987); *Schwabenbauer v. Board of Educ.,* 667 F.2d 305, 313–14 (2d Cir.1981).

 A genuine issue of material fact does not spring into being simply because a litigant claims that one exists. Neither wishful thinking nor "mere promise[s] to produce admissible evidence at trial," *Garside,* 895 F.2d at 49, nor conclusory responses unsupported by evidence, *Ayer v. United States,* 902 F.2d 1038, 1044–45 (1st Cir.1990), will serve to defeat a properly focused Rule 56 motion. After all, one who opposes a Rule 56 motion "may not rest upon her laurels (or her pleadings)." *Mack,* 871 F.2d at 181. Rather, the opponent must pull the laboring oar and "set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e). This requires hard evidence of a material factual dispute; the opposition cannot be "conjectural or problematic [but] must have substance." *Mack,* 871 F.2d at 181. Evidence which is "merely colorable, or is not significantly probative" will not preclude summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citation omitted).

**4.** Title III provides in relevant part:
It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception. . . .
18 U.S.C. § 2511(2)(d).

■ These rules are not suspended in cases where conclusions must be drawn from agreed or uncontradicted facts. In such instances, "[e]ven ... where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). The outcome depends upon the cogency of the conclusion which the movant asks the court to draw. When, as in the case before us, only a single conclusion is plausibly inferable from the uncontradicted facts, Rule 56 can properly be invoked. *See, e.g., Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 109 (1st Cir.1988); *Binkley Co. v. Eastern Tank, Inc.*, 831 F.2d 333, 337 (1st Cir.1987).

## III. THE MERITS

Plaintiff, as if bent on out-heroding Herod, *see generally* W. Shakespeare, *Hamlet*, Act III, sc. ii (1601), harangues stridently that *brevis* disposition of his complaints contravened both the general purposes of Title III and the specific rationale behind the statute's consent exception. Turning up the volume, however, cannot mask the paucity of content contained in plaintiff's argumentation.

### A. *The Law.*

Although plaintiff repeatedly declaims that wire communications are "protected absolutely from illegal interception," that rallying cry—like most sloganeering—overstates the proposition. Title III was intended to prohibit all interceptions "except those specifically provided for in the Act." *United States v. Giordano*, 416 U.S. 505, 514, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974). Congress, in its wisdom, chose to insert a myriad of exceptions and restrictive definitions into Title III, purposely leaving certain wire communications unprotected. *See, e.g.*, 18 U.S.C. § 2511(1) (prohibiting intentional interception and disclosure "[e]xcept as otherwise specifically provided"); *see also Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 489 (1st Cir.1989) (discussing some types of legal interceptions); *United States v. Axselle*, 604 F.2d 1330, 1334 (10th Cir.1979) (Title III outlaws only "willful" intercepts). Accordingly, there is little to be gained by pejorative declamations; the question is simply whether a particular intercept runs afoul of the statute's imperatives.

■ 18 U.S.C. § 2511(2)(d), *supra* note 4, outlines a Title III exclusion applicable "where one of the parties to the communication has given prior consent to such interception...." We agree with the Second Circuit that "Congress intended the consent requirement to be construed broadly." *United States v. Amen*, 831 F.2d 373, 378 (2d Cir.1987). In this spirit, we—and other courts—have held that Title III affords safe harbor not only for persons who intercept calls with the explicit consent of a conversant but also for those who do so after receiving implied consent. *See United States v. Willoughby*, 860 F.2d 15, 19 (2d Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989); *Amen*, 831 F.2d at 378; *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 581 (11th Cir. 1983); *Campiti v. Walonis*, 611 F.2d 387, 393 (1st Cir.1979). Acknowledging the doctrinal vitality of implied consent, however, does not address its parameters—nor can we suggest any pat, all-purpose definition. In the Title III milieu as in other settings, consent inheres where a person's behavior manifests acquiescence or a comparable voluntary diminution of his or her otherwise protected rights. *Cf., e.g., United States v. Garcia–Rosa*, 876 F.2d 209, 217–18 (1st Cir.1989) (discussing consent in fourth amendment context), *cert. denied*, — U.S. —, 110 S.Ct. 742, 107 L.Ed.2d 760 (1990); *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1126–27 (5th Cir.1988) (discussing consent re doctrine of conversion); *Calderon Rosado v. General Elec. Circuit Breakers, Inc.*, 805 F.2d 1085, 1087 (1st Cir.1986) (discussing consent under Civil Rules); 17 C.J.S. *Contracts* § 132 (1955); 86 C.J.S. *Torts* § 12 (1955).

■ Of course, implied consent is not constructive consent. Rather, implied con-

sent is "consent in fact" which is inferred "from surrounding circumstances indicating that the [party] knowingly agreed to the surveillance." *Amen*, 831 F.2d at 378; *see also United States v. Bonanno*, 487 F.2d 654, 658–59 (2d Cir.1973) (consent shown when "informer went ahead with a call after knowing what the law enforcement officers were about"); *cf. United States v. Gladney*, 563 F.2d 491, 493 (1st Cir.1977). Thus, implied consent—or the absence of it—may be deduced from "the circumstances prevailing" in a given situation. *Campiti*, 611 F.2d at 393. The circumstances relevant to an implication of consent will vary from case to case, but the compendium will ordinarily include language or acts which tend to prove (or disprove) that a party knows of, or assents to, encroachments on the routine expectation that conversations are private. And the ultimate determination must proceed in light of the prophylactic purpose of Title III—a purpose which suggests that consent should not casually be inferred. *See Watkins*, 704 F.2d at 581.

### B. *The Facts.*

■ In this case, we believe that the events material to the issue of prior consent are straightforward, hence effectively uncontroverted. A close reading of the record belies the existence of any legitimate dispute as to the subsidiary facts insofar as they bear upon plaintiff's knowledge of, and acquiescence in, Smith's taping of incoming calls.

The salient facts are these. Prior to September 14, Griggs–Ryan had been repeatedly informed that all incoming calls were being monitored. Smith's affidavit in this respect stands uncontradicted and unimpeached:

> On several occasions during the course of the summer I spoke to Mr. Ryan and informed him that all incoming telephone calls to my home were being tape recorded.... I had made it quite clear to Mr. Ryan by virtue of these several conversations that all of the incoming telephone calls to my home on my phones were being tape recorded.

There is no evidence that Smith, whatever her actual practice might have been, ever informed plaintiff that she would cease monitoring a call once she determined that it was not harassing. Indeed, the only record evidence speaking directly to this question is Smith's testimony at the state court suppression hearing, where the following colloquy occurred:

> Q. .... [W]hen you told Mr. Ryan that you were taping every phone call, did you tell him that you have stopped taping once you identified who the [caller] was?
>
> A. No.

To put these unqualified statements in issue, plaintiff's burden was to bring forth evidence to contradict them or show that, on September 14, he had some plausible reason to believe that fewer than all calls, or something less than all parts of all calls, were being recorded. *See Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510; *Mack*, 871 F.2d at 181. Plaintiff failed to carry—or even perceptibly to lift—this burden of production. His affidavit in opposition to summary judgment was altogether silent on the matter of his knowledge of Smith's actual taping practice and utterly devoid of any other factual predicate bearing on the issue of implied consent. Apart from the affidavit, he offered no other relevant evidence. Concededly, he asserted in a pleading that "[u]nbeknownst to the Plaintiff, and without his consent, Smith listened to and tape recorded the telephone conversation." Yet, this bald assertion, unsupported even by an affidavit anent his contemporaneous personal knowledge, cannot suffice to create a genuine issue of material fact in the Rule 56 sense. *See Medina–Munoz*, 896 F.2d at 8; *Rossy v. Roche Products, Inc.*, 880 F.2d 621, 624 (1st Cir. 1989); *Oliver*, 846 F.2d at 109.

Plaintiff attempts to fill this void by cutting and pasting other testimony given by Smith during the suppression hearing. The resultant patchwork, while perhaps remotely suggestive, proves nothing. The entire set of questions from which this material was extracted evolved in a series of free-standing, incomplete phrases that

alternated between asking about Smith's actual practice and about her statements to plaintiff. The excerpted testimony, placed in perspective, is so indefinite as to be profitless in the context of summary judgment review. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Medina–Munoz*, 896 F.2d at 10; *Mack*, 871 F.2d at 181; *Oliver*, 846 F.2d at 109. If summary judgment could be forestalled on so exiguous a showing, then Rule 56 would necessarily be relegated to the scrap heap where obsolete forms of action and hoary procedural devices—say, pleas in abatement and bills quia timet—are left to rust. The court below did not err in determining that, "[w]hile it may have been Smith's practice to stop taping calls once she was assured they were not obscene or threatening," there was no evidence that plaintiff was aware of the praxis. 727 F.Supp. at 687.

The matter brooks no further iteration. Following accepted summary judgment jurisprudence, we take as undisputed that (1) plaintiff was told unequivocally that all incoming calls would be recorded, and (2) Smith did not qualify the warning by telling him that she planned to listen only until she could ascertain whether the call was offensive.

## C. *Making the Connection.*

It remains only for us to link applicable law to undisputed fact. The district court ruled that plaintiff, in taking the call from Jackson and conversing with him on Smith's telephone, impliedly consented to the interception. *Id.* We think that this ruling was inevitable. Plaintiff had been unmistakably warned on a number of occasions that all incoming calls were being monitored. In light of so sweeping a warning, he continued to receive calls and talk unguardedly on Smith's personal line without the slightest hint of coercion or exigent circumstance. Plaintiff was free to use some other instrument; or since outgoing calls were not recorded, to return calls on Smith's telephone and thus avoid any unwanted eavesdropping. Given "the circumstances prevailing," *Campiti*, 611 F.2d at 393, it seems altogether clear that plaintiff "knowingly agreed to the surveillance."

*Amen*, 831 F.2d at 378. His consent, albeit not explicit, was manifest. No more was required. *See Willoughby*, 860 F.2d at 19–20 (consent implied from inmates' telephone use after repeated actual and constructive notice); *Amen*, 831 F.2d at 379; *Bonanno*, 487 F.2d at 658–59.

Plaintiff asserts that our earlier decision in *Campiti*, 611 F.2d 387, is to the contrary. The assertion is bootless. In *Campiti*, we applied a clear error standard, Fed.R.Civ.P. 52(a), and upheld the district court's refusal to imply consent from evidence showing that a prison inmate "should have known his call would probably be monitored." 611 F.2d at 393. But there, whatever suspicions might have taken wing, no general warnings had been given: although convicts commonly expected their calls to be monitored, "[t]here were *no regulations* at [the prison] informing inmates that telephone calls might be monitored." *Id.* at 390. And when monitoring occurred, the telltale, known to all inmates, was the close physical presence of an eavesdropping corrections officer. *Id.* Campiti elected to speak at a time when no officer was physically present, unaware that his jailers were listening on an extension telephone in another room. *Id.*

Griggs–Ryan, of course, cannot plausibly posit a claim of deficient notice similar to the claim which succeeded in *Campiti*. Smith's blanket admonishment left no room for plaintiff to wonder whether Jackson's call would be intercepted. There was no practice known to plaintiff which might have led him reasonably to believe that the call was beyond the scope of the admonishment. There was no discernible circumstance at the particular moment that might have led him reasonably to believe that this call was an exception to the "all incoming calls recorded" rule or that the monitoring of it would be less than total. In short, Griggs–Ryan, unlike Campiti, had considerably more than a mere expectation that his call might, or probably would, be monitored. In the face of express notice, it cannot be gainsaid that plaintiff impliedly consented to what later transpired.

Plaintiff's heavy reliance on *Watkins*, 704 F.2d 577, is similarly mislaid. In that case, an employee resigned because of a dispute over a personal call received during working hours. She sued, asserting that the employer's monitoring policy made clear that personal calls would be monitored only for the time necessary to determine they were not business-related. *Id.* at 579. The district court granted summary judgment in the employer's favor, believing that Watkins had impliedly consented to the interception. The Eleventh Circuit disagreed, finding material issues of fact relative to the scope of the employer's preannounced monitoring policy. *Id.* at 585. The *Watkins* holding is easily reconciled with the decision below.

In Title III terms, consent "is not necessarily an all or nothing proposition; it can be limited." *Id.* at 582. That is to say, the parameters of consent may be circumscribed depending on the subtleties and permutations inherent in a particular set of facts. Hence, a reviewing court must inquire into the dimensions of the consent and then ascertain whether the interception exceeded those boundaries. In the case before us, the scope of the implied permission ceded by plaintiff to the listener is constructed out of the same facts and circumstances as the existence of the consent itself. Phrased in slightly different terms, Smith's conduct on September 14 fell squarely within the parameters of what she had repeatedly told plaintiff to expect, and thus, fell squarely within the bounds of plaintiff's consent. Having persisted in using Smith's telephone to converse with callers in the face of unambiguous, unqualified notice that every incoming call would be monitored, plaintiff's consent necessarily encompassed every portion of every call he accepted on his landlady's line. The same was not true in *Watkins*. *See id.* at 581. This critical distinction destroys the parallel which Griggs–Ryan would have us draw.

Plaintiff's final fizgig, centering on the upshot of the state court suppression hearing, is equally unimpressive. It is true that the state court found plaintiff "unaware" that the call in question was being recorded. Even assuming, however, that the finding has evidentiary significance in a federal civil case involving persons not parties to the state criminal proceedings—a matter on which we do not opine—it is beside the present point. Whether a person is cognizant that a particular call is being recorded does not answer, or fully respond to, the question of whether the scope of consent previously granted was sufficiently expansive to cover a generalized practice of recording. *See id.; cf. Simmons v. Southwestern Bell Tel. Co.,* 452 F.Supp. 392, 396 (W.D.Okla.1978) (where caller "knew his calls were monitored, he had no reasonable expectation that [individual] calls would remain private"), *aff'd*, 611 F.2d 342 (10th Cir.1979).

## IV. CONCLUSION

Because plaintiff unqualifiedly consented to Smith's interception of all incoming calls, the latter's conduct was "not unlawful" within the meaning of 18 U.S.C. § 2511(2)(d). Consequently, no cause of action could be maintained against Smith under Title III. It follows inexorably that, since the interception itself was not accomplished in derogation of federal law, Connelly cannot be subjected to Title III liability for disclosure of what he knew at second hand about the conversation's contents. *See* 18 U.S.C. § 2511(1)(c), (d). A fortiori, the Town of Wells, as Connelly's employer, cannot be liable. The district court did not err in granting summary judgment in favor of all defendants.

We need go no further. Plaintiff, suing, has dialed a wrong number.

*Affirmed.*