George WILLIAMS, et al., Plaintiffs,

Ralph Dyer, Intervener,

v.

Richard POULOS, et al., Defendants.

Civ. No. 92–0069–B.

United States District Court,
D. Maine.

Sept. 3, 1992.

John S. Whitman, Richardson & Troubh, Portland, Me. and Allen S. Rugg, Kutak, Rock & Campbell, Washington, D.C., for plaintiffs.

E. Stephen Murray, Murray, Plumb & Murray, Portland, Me., for intervenor-plaintiff Dyer.

John A. McArdle, III, Daniel G. Lilley Law Offices, Portland, Me., for defendants Bowers, Rodrigue and Robichaud.

Peter T. Marchesi, Wheeler & Arey, P.A., Waterville, Me., for defendants Leighton and Probe.

Peter J. Detroy, III, Norman, Hanson & Detroy, Portland, Me., for defendants Poulos and Campbell, Poulos, Campbell & Zendzian.

## ORDER AND MEMORANDUM OF OPINION

BRODY, District Judge.

This matter is before the Court on the Plaintiffs' and Intervener's motions for a preliminary injunction. The Plaintiffs and Intervener allege that the Defendants intercepted and recorded telephone conversations in violation of federal and state law. *See* 18 U.S.C. §§ 2510–2521 and 15 M.R.S.A. §§ 709–713. The Plaintiffs and Intervener request that the Defendants be preliminarily enjoined from making any use or disclosure of the contents of those recordings. *See* 18 U.S.C. § 2520(b)(1) (authorizing preliminary equitable relief). For the reasons and subject to the conditions stated below, the motions are *GRANTED.*

## I. *Findings of Fact*

*Williams v. Poulos* is the most recently filed action in a string of related civil lawsuits and bankruptcy appeals, all of which can be traced to the demise of Consolidated Auto Recyclers, Inc. ("CAR").

Founded in 1988, CAR dismantled automobiles and resold used parts. By May 1990, CAR employed approximately one hundred forty people and operated throughout New England and in Atlantic Canada. Twenty employees worked in CAR's East Vassalboro, Maine headquarters, including Wayne Bowers, Rodney Rodrigue and John Robichaud who owned over 95% of CAR's stock. All three were members of the board of directors. In addition, Bowers was Chief Executive Officer and Treasurer and Rodrigue was President.

To finance its early growth and business operations, CAR developed a banking relationship with Casco Northern Bank. In February 1990, Casco Northern elected not to increase CAR's lines of credit. CAR found itself in a serious financial bind because the firm had already spent the additional money it expected to receive.

To finance continued expansion and business operations, CAR issued various forms of debt to a venture capital firm, Allied Capital Corporation and certain of its subsidiaries and affiliates ("Allied").[1] Although Allied invested some money in CAR beginning in late 1989, the bulk of Allied's approximately $4,500,000 investment was made after CAR's banking relationship with Casco Northern soured.

In May 1990, while CAR's financial condition deteriorated, Bowers, Rodrigue and Robichaud approached Richard Poulos, a lawyer with Poulos, Campbell & Zendzian. At the end of their meeting, Poulos told Bowers, Rodrigue and Robichaud that they needed a "workout guy" not a lawyer.

In May, Rodrigue hired Michael Leighton and Probe Investigative Services to install a telephone surveillance system able to monitor a single, preselected telephone line at CAR's headquarters throughout the course of a business day. According to Rodrigue, CAR's phone bill was almost $1,000,000 per month, a cost Rodrigue wanted to bring under control.

Leighton examined the telephone system used by CAR and determined that he lacked the skill and expertise to fabricate an appropriate monitoring system. Leighton sought advice and assistance from Jonathan Broome of Old England Electronics, Inc. Broome's principal business is repairing consumer electronics; he is not an authorized telephone system technician. Although Broome considered the request highly unusual and noted that CAR was unwilling to reveal why it wanted or needed the system, he was assured by Leighton that "everything was legal."

After discovering that there was no commercially available equipment designed to permit the interception and recording Rodrigue desired, Broome custom-designed a system to meet Rodrigue's specifications. Conversations were recorded with a hi-fi video-cassette recorder capable of running for six to eight hours.[2] Broome attached the VCR to CAR's telephone system with an interface which he described as a "shielded, isolated, impedance matching system" with a limiter capable of tying together two very dissimilar pieces of equipment: a VCR and a commercial telephone system. Broome indicated that it took "quite a bit of time and fiddle" to design the interface. Once attached, the interface, which "clipped on," had to be manually moved from one telephone line to another, permitting the recorder to identify and record from one preselected line at a time.

**1.** The term "Allied" is used throughout this opinion to refer to Allied and various combinations of its officers, subsidiaries, and affiliates. Although the overlap is not perfect from case to case, the differences are not significant for purposes of these motions. George Williams, the lead plaintiff in this case, is an officer of Allied Capital Corporation.

**2.** To permit faster review of the tape, Broome hooked up a camera facing the front panel of the VCR to record movement of the LED meter indicating when a conversation was recorded.

CAR was unable to quickly resolve its financial difficulties. Casco Northern declared CAR in default on May 29, 1990. Two days later, Allied also declared CAR in default.

On June 17, working after hours, Leighton and Broome installed the telephone monitoring system in a utility closet in CAR's headquarters, running an unobtrusive wire to the phone system. Probe submitted a bill for the work.

CAR's security officer, David Fisher, was instructed to deliver the tapes of recorded conversations to Wayne Bowers each day for review. Bowers indicated that he made cassette tapes of all telephone conversations he believed could be used to demonstrate impropriety after determining whether or not they were related to the business affairs of CAR.

By June 20, Bowers, Rodrigue and Robichaud had begun targeted taping of CAR's Chief Financial Officer, Richard Lee. Hired on Allied's recommendation, Rodrigue and Bowers doubted Lee's loyalty. According to Rodrigue, the tapes made did not substantiate their doubts about Lee's loyalty.

On June 27, while Rodrigue was in Washington negotiating with Allied, he learned that Lee had been communicating directly with Allied, violating instructions he had received from Bowers, Rodrigue and Robichaud. Rodrigue telephoned CAR's headquarters, requesting that tapes of Lee's conversations be prepared for review when he returned. The message was garbled, and David Fisher interpreted it as an instruction to remove the telephone taping system.

On June 28, 1990, Bowers, Rodrigue and Robichaud entered into an agreement with Allied effectively transferring control of CAR. Allied was given three seats on the board, to balance the three held by Bowers, Rodrigue and Robichaud. Ralph Dyer was hired as Chief Executive Officer of CAR at Allied's suggestion. Dyer also served as the seventh member and Chairman of the Board. Forty-three percent of the Allied's

voting stock was transferred by Bowers, Rodrigue and Robichaud to a voting trust for which an Allied employee served as trustee.[3]

After Rodrigue returned to Maine and learned the telephone surveillance system had been removed, he ordered that it be reinstalled. Rodrigue instructed Fisher to target Jim Starr, an outside accountant auditing CAR for Allied. According to Bowers, Rodrigue and Robichaud, Starr was targeted because he was spending an excessive amount of time talking with girlfriends. No tapes exist, however, on which Starr is talking with a girlfriend.

On June 29, Bowers, Rodrigue and Robichaud met with Ralph Dyer. During the course of several hours of orientation, Dyer was reportedly informed that CAR "randomly" monitored telephone calls of employees. Dyer denied that he was informed that telephone calls were randomly monitored. Rather, Dyer says he was told that "sales pitches" were monitored.

Dyer's relationship with Bowers, Rodrigue and Robichaud was strained from the beginning. By July 10, Rodrigue and Robichaud were feuding openly with Dyer. On July 17, Dyer obtained a temporary restraining order barring Rodrigue and Robichaud from CAR's headquarters. Rodrigue responded by ordering Michael Leighton and Probe Investigative Services to conduct an investigation of Dyer. Rodrigue paid Probe with a personal check.

The first tapes of Ralph Dyer's conversations were made on July 18, the day after the TRO issued. Bowers, Rodrigue and Robichaud acknowledge that they were explicitly targeting Dyer by July 19.

Bowers, Rodrigue and Robichaud were also taping and keeping copies of conversations made by Allied personnel at CAR to Allied's headquarters in Washington, DC, including telephone calls to Allied's in-house counsel. There are no indications that Allied knew of or consented to monitoring of its telephone conversations. According to Bowers and Poulos, however, the decision to continue targeted monitor-

---

3. Allied, through the trust and options on CAR stock it possessed, could exercise voting control.

ing of Dyer and Allied personnel was based on information obtained by listening to tapes of conversations involving only Allied personnel.

On July 21, Bowers, Rodrigue and Robichaud returned to Poulos, Campbell & Zendzian to meet again with Richard Poulos and his partner, John Campbell. In a two to three hour meeting, Bowers, Rodrigue and Robichaud told Poulos that they had taped and were continuing to tape telephone calls at CAR, indicated what they had learned from the tapes, and offered to play the tapes for Poulos. Poulos declined to listen to the tapes, but did not advise Bowers, Rodrigue and Robichaud to stop taping. By the end of the meeting, Bowers, Rodrigue and Robichaud had entered into a limited purpose representation agreement with Poulos to secure his help in regaining control of CAR, dealing with the board meeting scheduled for July 23, and responding to the TRO. Bowers, Rodrigue and Robichaud agreed to pay Poulos a $5000 retainer.

On July 22, Campbell drafted and delivered a letter to CAR indicating that Bowers, Rodrigue and Robichaud would be boycotting the CAR board meeting the following day.

On July 23, the board meeting was held telephonically so that the Allied employees in Washington, DC who had been appointed to CAR's board after the June 28th agreement was signed could participate. Bowers, Rodrigue and Robichaud did not attend the meeting; instead, they recorded it. Poulos spoke with Bowers about the tapes, writing the first of many memos to the file about their contents.

Also on July 23, representatives of CAR, Casco Northern, and Allied met to negotiate a forbearance agreement to address CAR's defaults. During the course of discussions, Poulos appeared on behalf of Bowers, Rodrigue and Robichaud. Poulos declared that Bowers, Rodrigue and Robichaud would never sign a forbearance agreement. He stated his opinion that the negotiations were "a sucker's game" and that the draft agreement was a "suicide pact."

On July 25, with Rodrigue and Robichaud barred from the CAR's headquarters and only Bowers allowed access, the taping system was removed. The equipment was returned to Michael Leighton and Probe Investigative Services. Poulos accepted copies of all the tapes made and directed a paralegal to begin transcribing them.

Four days later, CAR filed a Chapter 11 petition. Bowers, Rodrigue, and Robichaud as well as Allied and Dyer were later ousted after a trustee was appointed. CAR's bankruptcy proceedings were subsequently converted to Chapter 7.

On July 30, five days after receiving the tapes, Poulos entered into a new arrangement with Bowers, Rodrigue and Robichaud. Poulos agreed to pursue claims against Allied, Dyer and Casco in return for a contingent fee with $195,000 of the fee secured by mortgages on property owned by Bowers, Rodrigue and Robichaud. Poulos also agreed to represent them in CAR's bankruptcy proceedings.

On July 31, Poulos filed a motion to dismiss the bankruptcy petition. On August 6th, relying on the tapes of telephone conversations provided to him, Poulos prepared for a meeting with insurance company representatives (who sold CAR much of its inventory of wrecked automobiles). On August 7th, Poulos appeared at the initial bankruptcy hearing on behalf of Bowers, Rodrigue and Robichaud.

Although Dyer's telephone conversations at CAR were no longer being taped, Probe continued the investigation of Dyer ordered by Rodrigue. Photo surveillance continued through at least August 8th.

In early August, an associate at Poulos, Campbell and Zendzian, since separated from the firm, wrote a brief, unedited memo discussing the legality of intercepting and recording telephone conversations.

By August 13, Poulos was again reviewing and annotating transcripts of the tapes, as he continued to do frequently. According to Poulos, he had already decided that litigation was inevitable.

No later than October 1990, Poulos was spending an appreciable amount of time

drafting a complaint which would ultimately exceed 135 pages and include excerpts from taped telephone conversations among Allied employees.

On October 31, Poulos disclosed the existence of the tapes to Daniel Amory and David Crocker, attorneys for CAR's trustee in bankruptcy. After Poulos indicated that the tapes may have been "criminally obtained," Amory declined to accept them. Poulos asked that the information about the tapes be kept strictly confidential.

Poulos wrote Amory shortly afterwards, saying:

> In the course of a discussion with you ... I brought to your attention certain sensitive information which would likely be materially beneficial to the estate of CAR and the three principal individual shareholders ... in contemplated litigation if the information were used in an appropriate and timely fashion....
>
> I provided you with a brief description of the information so that you could understand why the disclosure of the existence of such information to parties or persons with an adverse interest to the estate and the principal individual shareholders would be extremely prejudicial if they became aware of such information prior to the completion of the depositions....
>
> In view of these circumstances, it is imperative that the existence of the information I outlined to you be kept extremely confidential....

Plaintiffs' Ex. 6.

Poulos did not receive copies of all the documents produced during the course of discovery in bankruptcy proceedings—upon which Poulos now contends this case is based—until November 1, 1990.

In January 1991, Bowers, Rodrigue, and Robichaud filed a lawsuit seeking $63,000,000 in damages against Allied, Dyer, and Leo Madden, a business associate of Dyer's. *Bowers v. Allied Capital Corp.*, Civ. No. 91–0021–B. As later amended, the complaint stated causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78kk, as well as a host of pendent claims. Allied moved to dismiss *Bowers* and countered by filing a lawsuit in the District of Columbia against Bowers, Rodrigue and Robichaud and against CAR's investment bankers and accountants. This Court dismissed Leo Madden, named in only one count, on July 1, 1991. After this Court dismissed the RICO but not the securities law claims in *Bowers*, 1991 WL 335252, the DC action was transferred to the District of Maine, *Allied Investment Corp. v. Gagan, White & Co.*, Civ. No. 92–0057–B. The stay on discovery was lifted and the cases were later consolidated.

Poulos immediately scheduled the depositions of Dyer, Madden and various Allied officials for early January, before copies of the tapes were produced to Dyer or Allied.

On January 15, Bowers, Rodrigue and Robichaud filed a motion for leave to file a third amended complaint to bring Leo Madden back into the case as a defendant. On January 31, Poulos met with John Connor, an attorney representing Leo Madden. Poulos told Connor that he had "secret tapes." Poulos indicated that he had irrefutable evidence that Madden had lied. Poulos produced a transcript of a July 23, 1990 telephone conversation between Dyer and Madden. Poulos indicated that his clients might settle their claims against Madden for $300,000 to $400,000. Connor was noncommittal. Poulos asked Connor to "tell no one for a while."

On February 3, Poulos met with Stephen Murray, Ralph Dyer's attorney. Poulos again indicated that he had tapes proving that Dyer had not been entirely candid during his deposition. Poulos demanded less money from Dyer, but indicated that he expected Dyer to cooperate with Bowers, Rodrigue and Robichaud and to remain in the case as a nominal defendant.

On February 26, Connor declined Poulos's settlement demand. On March 23, 1992, the Court denied Bowers, Rodrigue and Robichaud's motion for leave to amend their complaint to bring Madden back into the case as a defendant.

In April 1992, Allied filed an action alleging violations of federal and state wiretapping laws against Richard Poulos, John Campbell, Poulos, Campbell & Zendzian, Wayne Bowers, Rodney Rodrigue, John Robichaud, Michael Leighton and Probe Investigative Services. *Williams v. Poulos,* Civ. No. 92–0069–B. Dyer later intervened in the suit.

On August 7, 1992, the Court issued an order staying further proceedings in *Bowers v. Allied, Allied v. Gagan, White & Co.* and the two bankruptcy appeals arising out of CAR's Chapter 7 proceedings, *In re: Consolidated Auto Recyclers, Inc.,* Civ Nos. 92–0056–B and 92–0076–B until *Williams v. Poulos* is concluded.

## II. *Preliminary Injunction Standard*

To be entitled to a preliminary injunction, the Plaintiffs and Intervener must demonstrate (1) that they are likely to succeed on the merits; (2) that they will suffer irreparable injury if an injunction does not issue; (3) that such injury outweighs any harm which granting injunctive relief will inflict on the defendant; and (4) that the public interest will not be adversely affected if an injunction is granted. *See, e.g., Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). In this Circuit, an especially strong showing with respect to any of the four criteria may compensate for a relatively weak showing with respect to another. *Mariani Giron v. Acevedo Ruiz,* 834 F.2d 238, 240 (1st Cir.1987) (citations omitted).

## III. *Conclusions of Law*

■ After reviewing the facts, the federal wiretapping statutes and the caselaw, this Court is satisfied that a preliminary injunction should issue.

---

4. It is not necessary to address the scope or nature of the remedies which may be available to Plaintiffs and Intervener if they prevail at trial to decide this motion for a preliminary injunction.

5. The Defendants acknowledge that Dyer was not a party to all of the taped conversations, but

## A. *Likelihood of Success on the Merits* [4]

Federal law prohibits intentional interception of telephone conversations as well as intentional disclosure or use of their contents. In particular, 18 U.S.C. § 2511 provides that it is a crime for any person to:

(a) intentionally intercept[ ], endeavor[ ] to intercept or procure[ ] any other person to intercept or endeavor to intercept, any wire, oral or electronic communication;

. . . . .

(c) intentionally disclose[ ], or endeavor[ ] to disclose, to any other person the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection; or

(d) intentionally use[ ], or endeavor[ ] to use, the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection.

Allied and Dyer have demonstrated that Bowers, Rodrigue, Robichaud, Poulos, Campbell, and Poulos, Campbell & Zendzian intercepted their telephone conversations and disclosed and used their contents in a variety of contexts. The role played by Michael Leighton and Probe Investigative Services in facilitating the interception as well as procuring Broome's services subjects them to potential liability as well.

Bowers, Rodrigue and Robichaud respond that their conduct is exempt because they did not "intercept" conversations within the meaning of the federal statute. First, they contend the interceptions were not illegal because one of the parties to the recorded conversations, Ralph Dyer, consented.[5] *See* 18 U.S.C. § 2511(2)(d). Sec-

---

argue that the taping of Allied–Allied calls was inconsequential. In light of the Defendants' admission that the information gleaned from reviewing the tape which recorded a phone call from an Allied employee to Allied's in-house counsel prompted the Defendants to continue *targeted* monitoring of Dyer's phone line which

ond, they argue the interceptions were not illegal because they were made "in the ordinary course of its business...." 18 U.S.C. § 2510(5)(a). Neither argument is persuasive.

Whether a jury finds Dyer's version or Bowers and Rodrigue's version of what Dyer was told during his orientation meeting more credible, there is no plausible basis for concluding that Dyer consented to the targeted, continuous taping of his telephone conversations. Even if a jury credited the Defendants' version of events, that Dyer was informed about and impliedly consented to "random monitoring," Dyer never "consented" to the targeted monitoring which actually occurred. While the Defendants correctly note that consent may be implied, *Griggs–Ryan v. Smith*, 904 F.2d 112, 118 (1st Cir.1990), the scope of the consent depends on the circumstances and the nature of the warning given to the person whose calls were intercepted, *Campiti v. Walonis*, 611 F.2d 387, 393 (1st Cir.1979); *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 581–82 (11th Cir.1983). In *Griggs–Ryan*, the First Circuit held that a person who had been *"unmistakably warned on a number of occasions that all incoming calls were being monitored"* could not plausibly argue that he had not consented to recording of an incoming call he received. 904 F.2d at 118 (emphasis added). On the other hand, the First Circuit also noted that "consent 'is not necessarily an all or nothing proposition; it can be limited.' That is to say, the parameters of consent may be circumscribed depending on the subtleties and permutations inherent in a particular set of facts. Hence, a reviewing court must inquire into the dimensions of the consent and then ascertain whether the interception exceeded those boundaries." *Id.* at 119 (quoting *Watkins*, 704 F.2d at 582). Consent to "random monitoring" cannot be stretched so broadly that it includes consent to targeted interception of every telephone call placed by an individual while no other person in the firm is subject to similar surveillance.

they knew both Dyer and Allied used, it is clear that those tapes were not of trivial value.

Furthermore, the circumstantial evidence strongly indicates that Dyer did not impliedly consent to any monitoring. A jury could find that Dyer's version of events, that he was told only that salesman's pitches to clients were monitored, is more accurate. The Defendants' insistence on secrecy when the tapes and their contents were disclosed to non-parties implies that they knew Dyer and Allied were completely unaware that tapes were made. Poulos' letter to Amory indicates that Allied and Dyer were unaware of the taping, as does Defendant's memorandum in opposition to this motion for a preliminary injunction which notes that "[t]he indignation expressed by those parties is based, it appears, upon the fact that they had *no forewarning* that their scheming had been recorded, and that the recordings could be used to impeach them" (emphasis added).

Defendants also argue that their conduct is "exempted" by a provision of the federal statute that they term the "business purpose" exception.[6] *See* 18 U.S.C. § 2510(5)(a). According to the Defendants:

Such subsection exempts interceptions effected by:

(a) any telephone or telegram instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business....

This argument is also unavailing. It cannot be gainsaid that a video cassette recorder wired so that it can be attached to a telephone system through a "shielded, isolated impedance matching system" custom designed at considerable expense and with "a lot of time and fiddle" is not the sort of ordinary telephone equipment or "extension telephone" that Congress intended to

6. Most courts term the provision the "extension telephone" exception.

exempt. Rather, as designed, assembled and used, Defendants' monitoring system is precisely the sort of device "primarily useful for the purpose of surreptitious interception of wire, oral, or electronic communications" the manufacture and use of which Congress sought to ban. 18 U.S.C. § 2512.

Even if a highly modified VCR was a "telephone instrument," the asserted business purpose of Bowers, Rodrigue and Robichaud is questionable. It is virtually impossible to imagine how a VCR secreted in a closet capable of recording from a single telephone line at CAR's headquarters where fewer than one-fifth of CAR's employees worked and could be monitored could be used to combat excessive phone bills. It requires no great leap of logic, however, to conclude that the use Bowers, Rodrigue and Robichaud had in mind when they ordered the VCR monitoring system was the use to which they immediately put it: to record all of the telephone conversations made from a preselected telephone line during the course of the business day by CAR employees hired at Allied's suggestion and accountants sent by Allied so that Bowers, Rodrigue and Robichaud could monitor Allied's activities. A fixed intent to surreptitiously tape the conversations of a handful of people whose loyalty and motives Bowers, Rodrigue and Robichaud doubted is consistent with the secrecy which attended the design and installation of the monitoring system.

The Defendants also argue that even if the telephone conversations were illegally intercepted and recorded the Defendants are permitted to use the tapes to impeach witnesses at trial. Whatever the validity of that argument,[7] it is abundantly clear that the Defendants have used the tapes for purposes going well beyond impeachment. Poulos has repeatedly used the tapes to prepare for meetings and hearings at which no witnesses were testifying whom he might "impeach." Poulos has repeatedly disclosed the contents of the tapes to non-parties including lawyers for

banking institutions, CAR's bankruptcy trustee, and the United States trustee in attempts to prompt them to commence litigation against Allied and Dyer. Poulos has used the tapes and their contents to encourage defendants to capitulate in settlement negotiations. Finally, Poulos used the tapes to draft the complaint and conduct pretrial discovery.

Michael Leighton and Probe Investigative Services argue that they were not involved in the interception of telephone conversations because Leighton was never present when the recordings were made or reviewed. It is clear, however, that Leighton and Probe were deeply involved in the acquisition, design, and installation of the system. Probe generated the bills for the system and Probe received the system when it was ultimately removed. Even if Probe could demonstrate that it did not "intercept" any protected communications, Probe unquestionably "procure[d] another person to intercept or endeavor[ ] to intercept" protected communications when it subcontracted with Broome. Private detectives who provide eavesdropping equipment are subject to suit. See, e.g., White v. Weiss, 535 F.2d 1067, 1070 (8th Cir.1976).

In sum, Allied and Dyer have demonstrated that they are reasonably likely to prevail on the merits.

B. *Alternative Remedies*

Federal wiretapping statutes were enacted to protect the privacy of wire, oral and electronic communications. See Gelbard v. United States, 408 U.S. 41, 48, 92 S.Ct. 2357, 2361, 33 L.Ed.2d 179 (1972) ("protection of privacy was an overriding congressional concern"). Invasion of privacy, like injury to reputation, inflicts damage which is both difficult to quantify and impossible to compensate fully with money damages. Cf. K–Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir.1989); see also 18 U.S.C. § 2520(c) (plaintiff entitled to statutory damages if actual damages cannot be calculated). In 1986, Congress amended

---

7. The only court to consider the use of illegally obtained tape recordings in a civil case has held that the impeachment exception does not apply.

*Anthony v. United States,* 667 F.2d 870, 879 (10th Cir.1981).

the remedies available to a plaintiff in a civil lawsuit to explicitly authorize courts to grant "such preliminary and other equitable or declaratory relief as may be appropriate." 18 U.S.C. § 2520(b). Allied and Dyer have demonstrated that they have no adequate remedy at law.

### C. *Balance of Hardship Among the Parties*

If, as Defendants insist, they possess independent evidence and independent support for every portion of their case in Bowers, then enjoining them from making any further use or disclosure of the tapes or their contents will inflict no hardship upon them in preparing their case in *Bowers.* As this Court noted when it issued its order staying further proceedings in *Bowers,* trial will be delayed "for only a brief period of time" because *Williams v. Poulos* has been specially scheduled for trial in November. Plaintiffs and Intervener, in contrast, are subjected to continuing potential injury each time the Defendants use or disclose information obtained through interceptions of private conversations.

### D. *Public Interest*

There is strong public interest in protecting the privacy and security of communications in a society so heavily dependent on information. Where the potential harm to the Plaintiff is great, and the value of continued use of allegedly illegally obtained tapes is negligible, the public interest favors enjoining further use and disclosure of the contents of those tapes until the legality of the interception can be determined.

### IV. *Injunction*

The Plaintiffs and Intervener in *Williams v. Poulos* request a blanket injunction against "*any* further use or disclosure by the Defendants of the contents of intercepted communications." (emphasis added). Their request is overbroad. *See, e.g., McQuade v. Michael Gassner Mechanical & Electrical Contractors,* 587 F.Supp. 1183 (D.Conn.1984). Until the legality of the interceptions is finally adjudicated, defense counsel must be permitted to review and use the tapes and transcripts of the intercepted conversations, to the extent necessary, to prepare their defense. The Defendants in *Williams v. Poulos* are, however, *ENJOINED* from making any further use or disclosure of the tapes, transcripts of the tapes, and any information derived therefrom, other than for the purpose of preparing their defense in *Williams.*

SO ORDERED.