56 F.3d 59
 100 Ed. Law Rep. 909, 6 NDLR P 331
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Nancy D. MURPHY, Plaintiff, Appellant,
v.
FRANKLIN PIERCE LAW CENTER, et al., Defendants, Appellees.
 No. 95-1003.
 United States Court of Appeals,
First Circuit.
 May 31, 1995.
 
 Nancy D. Murphy on brief pro se.
 Russell F. Hilliard and Upton, Sanders & Smith on brief for appellees.
 D.N.H.
 AFFIRMED.
 Before TORRUELLA, Chief Judge, SELYA and BOUDIN, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is an appeal from the district court's grant of summary judgment in favor of appellee Franklin Pierce Law Center. The district court determined that appellant Nancy Murphy's claim of handicap discrimination in violation of Sec. 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794, failed as a matter of law.
 
 I. BACKGROUND
 
 2
 Murphy suffers from diplopia, a genetic condition in which weakness in the muscles of the eye causes double vision and problems with focusing on printed matter. She has had two surgeries (one necessitated by an automobile accident) for this ailment. Murphy manages the diplopia by limiting the amount of time spent reading and by engaging in muscular exercises prescribed by Dr. John Sebestyen, her treating physician. Nonetheless, when Murphy applied to the Law Center in 1987, she was reading without impairment.
 
 
 3
 Murphy began experiencing academic difficulties almost as soon as she entered the Law Center. At the end of her first year, her G.P.A. was 1.88-below the minimum G.P.A. of 2.0 set by the Law Center. Thus, Murphy came within the jurisdiction of the Academic Standing Committee ("ASC"). At this time, Murphy indicated that her difficulties were due to a thyroid condition and poor test-taking skills; she did not mention the diplopia. For her second year, the ASC required Murphy to maintain a G.P.A. of 2.0 and not to receive a grade below a C-.
 
 
 4
 Although Murphy met these requirements during the fall semester, she again came before the ASC as the result of receiving a D in Evidence during the spring semester. Combined with D+ grades in two first-year courses, Murphy now had more than nine credits below a C-. This was in violation of the Law Center's general academic regulations. Murphy submitted an analysis of her situation in which she cited, for the first time, the diplopia as one of the causes of her academic problems.
 
 
 5
 Specifically, Murphy stated that the diplopia produced double-vision, eyestrain, pain and headaches-all of which interfered with reading efficiency. On the advice of Dr. Sebestyen, Murphy did not read in the morning until she had been awake for three hours, did not read or study for more than three hours at a time, and slept when she had trouble focusing. In this letter, Murphy requested that she be allowed to take tests at three-day intervals so that her eyestrain would be reduced. At a meeting later in June, Murphy further asked the ASC to permit her to take oral examinations.
 
 
 6
 Murphy also submitted to the ASC a letter from Dr. Sebestyen, dated August 11, 1989. Based on a July 12 exam, Dr. Sebestyen concluded that Murphy's convergence was poor and that her eye muscles were weak. He recommended that she break up her reading and studying into "well-defined segments of time such as two hours at a time, or three hours at the most."
 
 
 7
 As for the fifth semester, the ASC allowed Murphy to take only nine credits-the usual minimum at the Law Center is twelve. The terms of Murphy's probation were that she obtain a 2.3 G.P.A., have no grades under a C- and not have more than one course with a C- grade. Again, Murphy did not appeal these terms. At the end of this semester, however, Murphy's G.P.A. was 1.89; she had failed one course and had received a D in another.
 
 
 8
 Murphy was dismissed from the Law Center by letter dated February 12, 1990. The ASC stated that its decision was based on (1) Murphy's failure to meet the terms of her probation, and (2) her entire academic record which demonstrated that she lacked the ability to complete the Law Center's degree program. Murphy then pursued an appeal of the decision of the ASC. The faculty upheld the dismissal essentially finding that although the ASC had made mistakes, they did not affect the question of Murphy's ability to satisfy the academic requirements of the JD program. Murphy then filed this action in the federal district court.
 
 
 9
 In granting the motion for summary judgment, the district court concluded that Murphy had not presented any evidence contradicting the Law Center's position that she was dismissed because she lacked the analytic skills necessary to succeed in law school. Thus, the district court concluded, she had not been dismissed "solely by reason of her disability." The court next held that the Law Center was entitled to summary judgment on the ground that Murphy was not otherwise qualified to complete the JD program. Specifically, the court found that Murphy had failed despite the fact that she had received all of the accommodations recommended by Dr. Sebestyen. This appeal ensued.
 
 II. THE LAW
 
 10
 A. Summary Judgment.
 
 
 11
 Our review of an order granting summary judgment is plenary. Wynne v. Tufts Univ. School of Medicine, 976 F.2d 791, 794 (1st Cir. 1992) ("Wynne II" ), cert. denied, 113 S.Ct. 1845 (1993). Thus, "we must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). If the record along with affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," we will uphold the grant of summary judgment. Fed. R. Civ. P. 56(c); Wynne II, 976 F.2d at 794.
 
 
 12
 B. The Rehabilitation Act.
 
 
 13
 Section 504 provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. Sec. 794. We have held that a Sec. 504 claimant must show that he or she (1) was dismissed from a program which receives federal funds, (2) was disabled, (3) but nonetheless was otherwise qualified, and (4) was dismissed solely because of his or her disability. Cook v. Rhode Island Dept. of Mental Health, Retardation, & Hospitals, 10 F.3d 17, 22 (1st Cir. 1993). The parties do not dispute that Murphy is disabled and that the Law Center receives federal funds. The primary question is whether (1) Murphy is an "otherwise qualified individual" (2) who was dismissed from the Law Center solely because of her handicap.
 
 
 14
 The district court found Murphy's claim wanting on both issues. Because we find that the district court correctly determined that Murphy is not an "otherwise qualified individual," we need not reach the second basis for the ruling below.
 
 
 15
 To be otherwise qualified for retention, Murphy must demonstrate that she was capable of satisfying the academic and technical requirements set by the Law Center with the help of reasonable accommodations. See McGregor v. Louisiana State Univ. Bd. of Supervisors, 3 F.3d 850, 855 (5th Cir. 1993), cert. denied, 114 S.Ct. 1103 (1994). Thus, we look to see whether the Law Center either provided reasonable accommodation for Murphy's diplopia or reached a rational conclusion that accommodating Murphy would unduly interfere with its academic program. See Wynne II, 976 F.2d at 793. Where, as here, the facts regarding what accommodations were made are not in dispute, this question is a legal one. Wynne v. Tufts Univ. School of Medicine, 932 F.2d 19, 26 (1st Cir. 1991) (en banc) (citation omitted).
 
 III. DISCUSSION
 
 16
 Murphy argues that the Law Center did not engage in the required analysis concerning what reasonable alternatives were available to it for the purpose of accommodating her diplopia. She points to the faculty's decision affirming her dismissal in which the involved faculty members note that the ASC never considered Murphy to be handicapped, never investigated the information contained in Murphy's letter of June 9, 1989, never consulted Dr. Sebestyen regarding the extent of the diplopia despite his letter of August 11, 1989, and never considered the effects of the diplopia in setting the probationary terms for Murphy's fifth semester. Murphy also claims that the Law Center, in fact, failed to provide any of the accommodations requested by her or recommended by Dr. Sebestyen.
 
 
 17
 The record reveals that the following adjustments were made for Murphy's fifth semester-the only time period to which Sec. 504's standards apply.[1] First, the ASC permitted Murphy to carry a reduced credit load. Of the four courses Murphy took, one was a "mini-course" in which the final examination was scheduled prior to the regular exam period. The grade in another course was based solely on written work. This left two courses in which Murphy was required to sit for standard examinations. Finally, Murphy requested, and received, an extra hour in which to complete her examinations.
 
 
 18
 We find that these measures satisfied the Law Center's obligation to provide reasonable accommodations to Murphy. Besides resting and being awake for three hours before reading, the only recommendation made by Dr. Sebestyen relevant to test-taking was that Murphy read in blocks of time no greater than two to three hours and that her tests be scheduled at three-day intervals. We note initially that there is no evidence that Murphy's fifth semester examinations were arranged in a manner contrary to Murphy's proposed schedule. Thus, it appears that she had sufficient time between her examinations to permit her to rest her eyes.
 
 
 19
 As for the extra hour for the completion of her examinations, Murphy complains that the only effect of this accommodation was to lengthen the three- to four-hour duration of finals to four to five hours. Thus, she concludes, she was forced to exceed the limits placed on her by Dr. Sebestyen. However, Dr. Sebestyen never indicated that Murphy required more than the usual time for completing her tests. Thus, instead of using the extra hour to complete the examinations, we perceive no reason why Murphy could not have taken the additional hour to rest her eyes or to sleep, thereby following Dr. Sebestyen's specific advice.
 
 
 20
 Murphy also emphasizes that she never was given oral examinations as she had asked. According to Murphy, in response to this request and in an apparent effort to understand the effects of Murphy's diplopia, the ASC arranged for a second Evidence examination to be administered orally. Due to a mix-up, however, the test was in written form when Murphy took it. When the ASC set the terms for the fifth semester, it nonetheless was under the mistaken impression that the exam had, in fact, been oral.
 
 
 21
 We do not find the want of oral examinations probative of a failure reasonably to accommodate Murphy's diplopia. Simply, there is no evidence that Murphy had difficulty reading for two or three hour time periods or that her comprehension was reduced by having to read, as opposed to hearing, her examinations. Dr. Sebestyen never recommended oral examinations or suggested that Murphy refrain from reading altogether. In short, Murphy has not shown that her performance would have improved through oral exams; that is, she has not shown that she would be otherwise qualified if tested orally.
 
 
 22
 Murphy further argues that by requiring her to maintain a 2.3 grade point average in the fifth semester, the ASC had demanded more of her than of non-probationary students (who needed to maintain only a 2.0 average). In this regard, Murphy points out that her overall average at the end of the fifth semester was 2.05-above the Law Center's minimum requirement. The faculty noted in its decision upholding Murphy's dismissal that students on probation were often required to have grade point averages higher than the minimum.
 
 
 23
 Murphy did not submit any evidence showing that she was singled out or that the ASC demanded the higher G.P.A. for discriminatory reasons. Merely requiring special probationary terms is not sufficient to demonstrate that the Law Center failed adequately to accommodate Murphy. See McGregor, 3 F.3d at 858 n.9, 860 (where disabled law student's G.P.A. was above the minimum imposed on non-probationary students, but below the G.P.A. set forth in the terms of his probation, Sec. 504 did not require the law school to let him proceed to his next year). In any event, Murphy still failed to comply with the generally applied academic provision that a student have not more than nine credits below a C-.
 
 
 24
 Murphy's most emphatic argument is that the district court erred in assigning the burdens of production and persuasion that the parties must meet in a Rehabilitation Act claim. She correctly notes that the circuits are divided on this question. One camp holds that the plaintiff must make a prima facie showing that she would be qualified to participate in the program if reasonable accommodations were made. The burden then shifts to the defendant to produce evidence that reasonable accommodations were made and/or that the plaintiff's requested accommodations would unduly interfere with the quality or integrity of the program. At that point, the burden shifts back to the plaintiff to rebut that evidence or show that the institution's actions were a pretext for discrimination. See, e.g., Teahan v. Metro-North Commuter R. Co., 951 F.2d 511, 515-16 (2d Cir. 1991). Another camp places on the defense the burden of persuasion, rather than production. See, e.g., Pushkin v. University of Colorado, 658 F.2d 1372, 1387 (10th Cir. 1981). This circuit has never squarely addressed the issue.
 
 
 25
 Murphy argues that the district court wrongly applied the production standard rather than the persuasion standard. But under any standard she must, at the very least, make a sufficient prima facie case that she would be qualified with the aid of oral examinations, the only requested accommodation that the school did not provide. As we noted earlier, she did not make that showing. Murphy's tests were administered at intervals of several days, and they did not require her to read for more than three hours without a break. There is no reason to think that Murphy's performance would improve if she were not required to take written examinations at all.
 
 IV. CONCLUSION
 
 26
 The fact that the ASC might not have specifically considered the effects of Murphy's diplopia in determining what accommodations to provide does not mean that the accommodations she actually received were not "reasonable" within the meaning of Sec. 504. We therefore conclude that, as a matter of law, Murphy was not otherwise qualified for retention as a student at the Law Center. That is, even with the accommodations provided by the ASC, she was unable to meet both the Law Center's degree requirements and the terms of her probation.
 
 
 27
 The judgment of the district court is affirmed.@
 
 
 
 [1]
 Because Murphy never informed the Law Center that the diplopia was interfering with her ability to perform until after the end of her fourth semester, it is not chargeable with notice of this handicap before then. See Wynne II, 976 F.2d at 795 (to be liable under Sec. 504, an academic institution must have, or reasonably be expected to have, knowledge of a student's disability) (citation omitted)