Brew v. Ferraro                          CV-95-615-JD  07/28/98
                  UNITED STATES DISTRICT COURT FOR THE
                        DISTRICT OF NEW HAMPSHIRE


Mary J. Brew

        v.                              Civil No. 95-615-JD

Thomas Ferraro, M.D., et al.


                              O R D E R


        The plaintiff, Mary Brew, brought this action asserting,

inter alia, claims for medical malpractice and intentional

infliction of emotional distress against the defendants Dr.

Thomas Ferraro, Dr. Guy Leadbetter, and Concord Urology, P.A.

("Concord Urology").  Before the court is the defendants' motion

for summary judgment (document no. 38).


                            Background[1]

        The plaintiff first suffered from a urinary tract infection

("UTI") when she was eighteen months old.  Although the infection

was treated successfully with medication, it was recurrent and

led to the plaintiff's admission to Concord Hospital on February

20, 1963.  At the time the plaintiff was four years old and

suffered from incontinence.

_____

        [1]The facts related herein are alleged by the plaintiff or
are not in dispute.

Upon the plaintiff's admission to Concord Hospital, the plaintiff's mother signed a general consent form authorizing treatment or operation that was "necessary or advisable in the diagnosis and treatment of this patient." Second Am. Compl. at 3. Defendant Ferraro was her attending physician and performed a cystoscopy and cystogram, from which he diagnosed the plaintiff as suffering from ureteral reflux, meatal stenosis, and bladder neck contracture or obstruction.

At the time of Ferraro's diagnosis, a common, although not universal, theory of pediatric urologists was that UTIs were often caused by a congenital abnormality that constricted or obstructed the bladder neck. This school of thought theorized that the physical obstruction prevented normal urination which in turn caused urine to "reflux" or flow back up into the kidney. The result was an infection that, if left untreated, could seriously threaten the entire urinary system. Many pediatric urologists treated the "bladder neck contracture," as the congenital condition was known, by surgically altering the bladder neck.

To correct the condition several widely used surgical methods were employed, one of which was called a "Bradford Young Y-V plasty." This operation involved making an incision at the bottom of the bladder at the bladder neck, removing a portion of

2

the wall of the bladder neck, and then folding and closing the surgical opening. See Second Am. Compl. at 4. The Y-V plasty was performed "hundreds, if not thousands, of times between 1954 and the late 1960s." See id.

Over time, however, pediatric urologists found that the bladder neck constriction was a symptom of UTIs, as the infection caused a swelling of bladder tissue, and not the cause. By approximately 1970, the practice of surgical correction stopped and a child's recurrent UTIs were treated with medication. Recurrent UTIs eventually would come to an end as the child's urinary system matured.

On February 23, 1963, Ferraro recommended a Y-V plasty to the plaintiff's parents, advised them that the alternative was long-term and fairly constant drug therapy, and indicated that he could perform the surgery or refer the plaintiff to defendant Leadbetter, a national expert in the procedure. He neither informed the plaintiff's parents that the procedure could result in total, permanent incontinence nor indicated the health consequences of such incontinence. The plaintiff's parents did not sign any additional consent form other than the general consent form signed upon the plaintiff's admission.

On February 25, 1963, the plaintiff underwent the Y-V plasty. During the procedure, Ferraro cut so far down into the

3

plaintiff's urethra that he damaged her urinary sphincter and her urethra and caused the plaintiff to become permanently incontinent. As opposed to the plaintiff's prior incontinence which was the result of the UTIs, this incontinence was structural. Because the plaintiff was previously incontinent, however, the cause of her continued incontinence, the Y-V plasty, was not realized by the plaintiff or her parents. Three months after the surgery, still incontinent, the plaintiff returned to Ferraro. Ferraro noted in medical records that the plaintiff's bladder neck "appeared wide open," indicating that the incontinence could no longer be caused by the bladder neck contracture, but he did not inform the plaintiff or her parents of this. See Second Am. Compl. at 7. Instead, he recommended that they seek a second opinion from Leadbetter.

On July 10, 1963, the plaintiff was admitted to Massachusetts General Hospital ("MGH") to see Leadbetter. Leadbetter noted her incontinence and although he was unsure of the nature, extent, or cause of the incontinence, he determined that her urethra was short. Leadbetter recommended treating the infection and awaiting the results, deferring incontinence surgery for six months.

Because the plaintiff remained incontinent she was readmitted to MGH in May of 1964. On May 3, 1964, the

4

plaintiff's mother signed a general consent form.  On May 6, 1964, Leadbetter operated on the plaintiff to correct the damage that was done to her urethra as a result of the Y-V plasty performed by Ferraro.  He titled the procedure a "Urethral Lengthening Procedure for Incontinence."  See Second Am. Compl. at 8.  The procedure required removing muscle tissue from the bladder wall to reconstruct the urethra.  A catheter was temporarily inserted into the plaintiff and the tissue was folded over it.  The catheter, which in all cases is of a narrower diameter than a natural urethra, functioned as a splint around which the reconstructed urethra took shape.  The result of the reconstructive procedure was a urethra that was shaped very differently than a normal urethra - it was kinked or corkscrewed and was narrower than a normal urethra.

After the operation the plaintiff slowly became more continent, although she had frequent UTIs that Ferraro treated.  Treatment required repeated catheterizations:  the manual draining of the bladder by inserting a catheter or tube into the plaintiff.  However, neither Leadbetter nor Ferraro ever explained to the nurses inserting the catheter, or to the plaintiff or her parents, that the plaintiff's urethra was of an unusual shape or size.  The catheterizations were therefore extremely and unnecessarily painful, and although the pain was

5

extraordinary, nurses performing the procedures failed to modify the protocol or investigate possible medical causes or solutions.

Ferraro himself performed the catheterizations on numerous occasions. The reports on these catheterizations indicate his knowledge of the plaintiff's unusually shaped reconstructed urethra. Neither the plaintiff nor her parents were told the reason for the extraordinary pain.

In 1968 the plaintiff began suffering from a tightening of her urethra which was diagnosed by Ferraro as "strictures," an extremely rare condition in female children. Although the strictures were a consequence or evolution of the plaintiff's condition after the reconstructive surgery, or alternately, of the repeated catheterizations, Ferraro falsely characterized the strictures as a reappearance of the bladder neck contracture or obstruction which he had originally diagnosed and attempted to remedy by the Y-V plasty.

As the years passed, the strictures, their necessary treatment, and the natural evolution of the plaintiff's condition after the reconstructive procedure led to the degradation of the plaintiff's urethra. The plaintiff had increasing difficulty urinating; by her mid-teens she could no longer void urine on a regular basis, and by 1975 she had to catheterize herself daily. Moreover, the degradation of the plaintiff's physical condition

6

was exacerbated by the catheterizations.  Upon learning that she would need to permanently self-catheterize, the plaintiff attempted suicide.  The plaintiff presently faces the probability that she will require a urinary diversion through her abdomen and the collection of her urine in a bag.  She self-catheterizes every six hours.

In 1964, at the time Leadbetter performed the reconstructive surgery that came to be known as the "Leadbetter procedure," the procedure was experimental.  He had just published an article in the Journal of Urology entitled "Surgical Correction of Total Urinary Incontinence."  The article describes a series of five cases or operations to restore continence caused by damage to or failure of the urethral sphincter muscle.  Three of the five cases reported were young female children who were made incontinent by Y-V plasties.  The article described the reconstructive procedure as "new" and indicated that "imperfect results . . . are due to inevitable errors which are inherent in the development of any new surgical procedure."  Second Am. Compl. at 9.  Leadbetter continued to publish articles on the reconstructive procedure to restore incontinence.  In three more articles, published between 1965 and 1967, Leadbetter further described the surgery and its effects on a small case study of approximately five to fifteen patients.  Circumstantial evidence

7

indicates that the plaintiff was one of the patients who had undergone the reconstructive surgery as a result of an unsuccessful Y-V plasty. Neither Leadbetter nor Ferraro explained to the plaintiff or her parents that the reconstructive surgery was experimental.

Leadbetter had diagnosed the plaintiff as suffering from incontinence caused by Ferraro's Y-V plasty. Leadbetter did not inform the plaintiff or her parents that the reconstructive procedure was being performed to correct the damage inflicted during the Y-V plasty. Ferraro expressly told the plaintiff's parents that the reconstructive surgery was another "bladder neck revision"[2] to correct the same bladder neck contracture that Ferraro had corrected with his earlier Y-V plasty. To conceal the true relation between the operations, Ferraro consistently recorded the second surgery as a "bladder neck revision" in the plaintiff's medical records despite his knowledge otherwise.

The plaintiff sought treatment from Ferraro until 1980. At some time after July 2, 1973, Ferraro became an employee of defendant Concord Urology. While employed by Concord Urology, Ferraro provided medical services for the plaintiff in connection with her urological problems.

---

[2]"Bladder neck revision" is the term used in medical literature for a Y-V plasty.

8

The plaintiff continued to seek treatment after leaving the New England area for college. Although the plaintiff saw two doctors over a number of years, Dr. Arnold M. Kwart and Dr. E. Everett Anderson, neither doctor ever disabused the plaintiff or her family of the mistaken conception that her incontinence was caused by a congenital defect, nor did they reveal the nature of the surgeries. Finally, in 1990, Dr. Kwart gave the plaintiff her first indication that her urological problems might be related to the Y-V plasty. Dr. Kwart informed her that the Y-V plasty procedure was a new and experimental surgery at the time it was performed on her, but that it was performed in accordance with the then-prevailing standard of care. Dr. Kwart never informed her that the Leadbetter procedure involved the reconstruction of her urethra.

In a letter to her insurance company in December of 1991, the plaintiff indicated her knowledge of the following: (1) a local urologist in her New Hampshire hometown had performed an operation on her bladder that was relatively new; (2) the surgeon damaged important nerves and muscles through an incorrect incision; (3) the surgery caused her incontinence; (4) a surgeon in Boston reconstructed her bladder neck and twisted her urethra into a corkscrew. On November 13, 1993, with her attempts to secure proper health care frustrated by her lack of knowledge

9

regarding her own health, the plaintiff purchased a urology textbook. The plaintiff found Leadbetter's name referenced, as well as his articles. At this point the plaintiff began to understand more fully her medical history.

On December 22, 1995, the plaintiff filed a complaint in the United States District Court for the District of New Hampshire. The complaint has been amended twice. Pursuant to the second amended complaint, the plaintiff alleges nine counts against Ferraro, Leadbetter, and Concord Urology, as follows: (1) lack of informed consent and medical battery against Ferraro;[3] (2) malpractice in the performance of surgery against Ferraro; (3) concealment of and failure to disclose the plaintiff's true medical condition against Ferraro and Leadbetter; (4) failure to provide adequate post-operative care against Ferraro and Leadbetter; (5) medical battery against Leadbetter; (6) malpractice in the diagnosis and determination of treatment against Leadbetter; (7) intentional infliction of emotional distress against Ferraro and Leadbetter; (8) negligent infliction of emotional distress against Ferraro and Leadbetter; and (9) respondeat superior liability against Concord Urology.

---

[3]Although the plaintiff originally stated a claim in count one for medical battery against Ferraro, she subsequently dropped this claim. See Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 13.

10

## Discussion

The role of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (quoting Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)). The court may only grant a motion for summary judgment where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The parties seeking summary judgment bear the initial burden of establishing the lack of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). The court must view the entire record in the light most favorable to the plaintiff, "'indulging all reasonable inferences in that party's favor.'" Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). However, once the defendants have submitted a properly supported motion for summary judgment, the plaintiff "may not rest upon mere allegation or denials of [her] pleading, but must

11

set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)).

The defendants assert that summary judgment on the plaintiff's claims is warranted because: (1) all the plaintiff's claims are barred by a two-year statute of limitations; (2) the plaintiff's parents consented to the procedures at issue and the plaintiff cannot prove causation regarding the informed consent and the medical battery claims, counts one and five; (3) New Hampshire does not recognize a separate tort based on "concealment and failure to disclose medical condition," count three; and (4) the defendants' conduct was not extreme or outrageous, one element necessary to the plaintiff's intentional infliction of emotional distress claim, count seven. The court considers these arguments for each count individually.[4]

At the outset, the court addresses two preliminary issues. First, the court assumes for the purposes of this order that the plaintiff had knowledge of the tortious acts and the harm she suffered in 1990, as the defendants assert, and not in 1993, as the plaintiff alleges, because it is immaterial to the outcome.

_____

[4]The defendants have also requested oral argument. However, the court finds oral argument to be unnecessary for the resolution of these issues.

12

Second, because it is relevant to every count alleged, the court addresses generally the statute of limitations for personal actions.

A.    Statute of Limitations

Under New Hampshire law, the statute of limitations governing personal injury actions and medical malpractice has evolved significantly over the last forty years.  However, each revision has consistently employed certain terms that are central to their application:  (1) a cause of action arises when the harmful act or omission complained of occurs and the causal negligence is coupled with harm to the plaintiff - to arise means "'to originate from a specified source', or 'to come into being,'" Conrad v. Hazen, 140 N.H. 249, 251, 252, 665 A.2d 372, 374, 375 (1995) (citations omitted); (2) a cause of action accrues when "'the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered both the fact of his injury and the cause thereof,'" id. at 250-51, 665 A.2d at 374 (citations omitted) (referred to as "common law discovery rule," later codified at N.H. Rev. Stat. Ann. ("RSA") § 508:4 (I) (1997), as when "plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of."

13

In 1963, the earliest date of direct relevance to the events in this case, the statute of limitations for a medical malpractice claim was two years from the date that the cause of action accrued.  See Patrick v. Morin, 115 N.H. 513, 514, 345 A.2d 389, 390 (1975) (citing RSA § 508:4 not specifying effective date).  The parties agree that the plaintiff's claims are encompassed by the term "malpractice" as used in the pre-1969 two-year statute of limitations.  See id., 345 A.2d at 390.  Effective July 2, 1969, RSA § 508:4 was amended to extend the statute of limitations for personal actions, including malpractice, to six years after the cause of action accrued, although the amendment would not "affect causes of action accrued prior to its effective date."  1969 N.H. Laws 378:1; see also Patrick, 115 N.H. at 514, 345 A.2d at 390.  Implicit in this provision is the fact that the six-year statute of limitations was to be applicable to causes of action that had arisen under the two-year statute but that had not yet accrued as of July 2, 1969.

RSA § 508:4 was further amended in 1981 and 1986.  The 1981 amendment has no relevance to this case.  Pursuant to the 1986 amendment, the six-year statute of limitations for personal injury actions was shortened to three years from the date the act or omission occurred.  However, the statute also codified the

14

common law discovery rule. It specifically provides that the three year statute shall run from "the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of" when such injury and its relation to the challenged act "were not discovered and could not reasonably have been discovered at the time of the act or omission." RSA § 508:4 (1997). This amendment became effective July 1, 1986, and applies "to all causes of action arising on or after July 1, 1986." 1986 N.H. Laws 227:22 (II).

Pursuant to the 1969 amendment, therefore, a malpractice cause of action which arose and accrued before 1969 would have had a two-year statute of limitations. A malpractice cause of action that arose before July 2, 1969, but which did not accrue until after that date would have the benefit of the six-year statute of limitations. A cause of action that arose between 1969 and 1986 but that accrued after 1986 similarly would have a six-year statute of limitations. Finally, a cause of action arising after 1986 would be subject to a three year statute of limitations.

The defendants point to language from the New Hampshire Supreme Court in Conrad that indicates that the relevant statute of limitations for causes of action that arise prior to the 1986

15

statute is the statute in effect at the time that the cause of action arose.  The court in <u>Conrad</u> stated:

> We hold, therefore, that a plaintiff who alleges an injury based on a defendant's conduct that occurred prior to July 1, 1986, but where either the injury or its cause was not discovered until sometime after that date, would have the benefit of the six-year statute of limitations and the common law discovery rule.  By creating a bright line rule that determination of the appropriate standard will be governed by the time when the act occurred, we avoid the confusion that could result from linking the applicable statute to the date of accrual.
>
> The plaintiff's cause of action arose in 1977, when the sexual assault allegedly occurred, and is therefore governed by the six-year statute of limitations.  The trial court erred in applying the post-1986 three-year statute of limitations to the facts in this case and granting summary judgment.

<u>Conrad</u>, 140 N.H. at 252, 665 A.2d at 375.  In <u>Conrad</u> the court was confronted with a cause of action that arose in 1977 but that accrued in 1991.  <u>See</u> <u>id.</u>, 665 A.2d at 375.  On appeal, the Supreme Court of New Hampshire held the six-year statute of limitations applicable to the claim before the court and overruled the trial court's determination that had applied the post-1986 three-year statute of limitations.  <u>See</u> <u>id.</u>, 665 A.2d at 375.

The defendants' interpretation of <u>Conrad</u> is an artifact of removing the quoted language from its context.  The court stated that the applicable statute of limitations is to be determined by

the date on which the act occurred, that is, the date the cause of action arose. See id., 665 A.2d at 375. However, this was prefaced by the court's determination that July 1, 1986, shall be the bright line date distinguishing between causes of action governed by the six-year statute of limitations and those governed by the three-year statute of limitations. See id., 665 A.2d at 375. Therefore, regardless of whether the cause of action arose under the two-year statute or the six-year statute, if it arose before July 1, 1986, the six-year statute of limitations is applicable.

The New Hampshire Supreme Court ruling preserves the time periods that the legislature has established for various causes of action. As discussed above, with the exception of causes of action that arise after July 1, 1986, the only time period other than a six-year time period is the two-year time period applicable to causes of action that arose and accrued before the 1969 amendment. However, these causes of action are already extinct and are therefore irrelevant to the New Hampshire Supreme Court's ruling.[5]

---

[5]This court's discussion does not address causes of action that were excepted from the six-year statute of limitations by the 1981 amendment.

B.    Lack of Informed Consent and Medical Malpractice: Ferraro

The plaintiff alleges that in February of 1963 when Ferraro obtained the consent of the plaintiff's mother for the Y-V plasty he failed to inform the plaintiff or her parents that:  (1) there were alternatives to surgery, including drug therapies, that would have provided adequate medical attention; (2) the medical community at the time of the operation held the diagnosis of bladder neck contracture and the surgical treatment of it in dispute; and (3) the Y-V plasty posed a risk of permanent incontinence.  The plaintiff also alleges that in February of 1963 Ferraro failed to perform the Y-V plasty according to the appropriate standard of care.

The plaintiff's claims against Ferraro in counts one and two alleging a lack of informed consent and medical malpractice therefore arose in February of 1963 under the pre-1969 two-year statute of limitations.  However, the applicable statute of limitations is the 1969 six-year statute of limitations because the lack of informed consent claim and the medical malpractice claim had not yet accrued as of 1969.  See 1969 N.H. Laws 378:1 ("This section shall not affect causes of action accrued prior to its effective date."); see also Patrick, 115 N.H. at 514, 345 A.2d at 390.  Because the cause of action accrued in 1990 and the complaint was filed in 1995, it is not barred by the statute of

limitations.[6]


C.    Concealment of and Failure to Disclose True Medical
      Condition:  Ferraro and Leadbetter

The plaintiff asserts that both Leadbetter and Ferraro had affirmative duties to disclose the following:  (1) the plaintiff's true medical condition after the Y-V plasty; (2) the true relationship between the Y-V plasty and the Leadbetter procedure; and (3) the plaintiff's actual physical condition after the Leadbetter procedure.  As a result of their failure to disclose to the plaintiff her true medical condition, she endured unnecessary and repeated pain, suffering, and humiliation, and the degradation of her physical condition was exacerbated.

The defendants counter the plaintiff's claims on two grounds.  The defendants first challenge the claims on the basis of the statute of limitations, arguing that Ferraro's duty arose in 1963 immediately after the 1963 Y-V plasty, and that Leadbetter's duty arose in 1964 at the time of the 1964

---

[6]The defendants also argue that summary judgment should be granted on the informed consent claim against Ferraro as the plaintiff and her mother testified that they would have made the same decision to undergo surgery if they had been more fully informed.  However, the court rejects this argument as the testimony cited by the defendants relates only to the surgical procedure performed by Leadbetter, not Ferraro.  See Defs.' App. at 139-40, 149, 155-157.  No informed consent claim is alleged against Leadbetter.

19

reconstructive procedure. Therefore, they urge, the claims are barred by the pre-1969 two-year statute of limitations. However, as with the informed consent and medical malpractice claims, the 1969 amendment that extended the statute of limitations to six years is the applicable statute governing these claims as the claims had not yet accrued in 1969. Because the plaintiff's claim accrued in 1990 and the complaint was filed in 1995, the cause of action is not time-barred.

The defendants also challenge the plaintiff's claim arguing that the alleged cause of action, concealment and failure to disclose the plaintiff's true medical condition, is not cognizable under New Hampshire law. The defendants characterize the plaintiff's claim as asserting a novel cause of action for "fraudulent concealment." Although the plaintiff supplies no New Hampshire authority in support of count three, the court disagrees with the defendants' characterization and understands count three of the plaintiff's second amended complaint to allege a breach of Ferraro's and Leadbetter's duty to disclose, giving rise to an informed consent cause of action.

RSA § 507-E:1(I)(1997) defines "medical injury" to include any "adverse, untoward or undesired consequences arising out of or sustained in the course of professional services . . . from rendition of such services without informed consent . . . ."

20

"Generally a doctor has a duty to inform his patient of the reasonable risks involved in an operation or treatment so that the patient can make an effective choice." Folger v. Corbett, 118 N.H. 737, 738, 394 A.2d 63, 63 (1978); see also RSA § 507-E:2 (II) (1997). To the extent that the defendants failed to disclose information to the plaintiff or her parents relevant to their decisions regarding her medical treatment and the risks or hazards involved, the plaintiff has stated a cause of action under New Hampshire law. Knowledge of the plaintiff's actual physiological condition after the Y-V plasty and the Leadbetter procedure was surely relevant to an effective choice regarding future treatment, as was information pertaining to the relationship between the Y-V plasty and the Leadbetter procedure.

D. Failure To Provide Adequate Post-Operative Care: Ferraro and Leadbetter

The plaintiff alleges that Ferraro and Leadbetter breached their obligations to provide adequate post-operative care and to adequately supervise the post-operative care provided to the plaintiff by other medical providers. The plaintiff continued to be regularly treated by Ferraro until her departure for college in 1977, with occasional treatment continuing until 1980. The last time that the plaintiff was treated by Leadbetter was in

21

July of 1975.  The plaintiff's cause of action therefore arose prior to 1986, although it accrued in 1990.  Consequently, it is governed by the six-year statute of limitations that began running from the date of accrual and is not barred by the statute of limitations.

E.    Medical Battery: Leadbetter

The plaintiff contends that Leadbetter is liable for medical battery as he failed to inform her or her parents regarding the true nature of the operation he performed in May of 1964 and its relation to the Y-V plasty.  The defendants challenge this count of the plaintiff's complaint.  Relying on Iowa law, the defendants argue, and the plaintiffs agree, that a medical battery claim "is appropriate only in circumstances when a doctor performs an operation to which the plaintiff has not consented." See Moller v. Stallings, 387 N.W.2d 599, 601 (Iowa 1986).[7]  The

---

[7]Pursuant to New Hampshire law:

An actor is subject to liability to another for battery if

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and

(b) a harmful contact with the person of the other directly or indirectly results.

Restatement (Second) of Torts § 13 (1965); see also New Hampshire Civil Jury Instructions 3rd § 20.1 (1994).  "A bodily contact is

22

defendants argue that the plaintiff's cause of action for medical battery must fail because the plaintiff's mother: (1) understood that the procedure Leadbetter was to perform involved the reconstruction of the plaintiff's urethra; (2) signed a consent form to "administer such anesthetics: and perform such operations as may be deemed necessary"; and (3) testified that she gave Leadbetter her consent to perform the procedure he performed.[8]

In support of their contention that the plaintiff's mother understood the procedure performed by Leadbetter, the defendants rely on the following language from the deposition of the

---

offensive if it offends a reasonable sense of personal dignity. It must be a contact which is unwarranted according to the social values prevalent at the time and place at which it is inflicted." New Hampshire Civil Jury Instructions 3rd § 20.1 (II) (1994). "[T]he plaintiff's consent to the contact with his person will prevent the liability. The absence of such consent is inherent in the very idea of those invasions of interests of personality which, at common law, were the subject of an action of trespass for battery . . . . Therefore the absence of consent is a matter essential to the cause of action, and it is uniformly held that it must be proved by the plaintiff as a necessary part of his case." Restatement (Second) of Torts § 13, cmt. d (1965). New Hampshire law thus imposes the same consent requirements as Iowa law.

[8]The defendants also argue in the alternative that the medical battery count must fail as an informed consent claim. However, as the plaintiff expressly states that this count sounds only in battery, the court does not address the defendants' informed consent argument. See Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 13.

plaintiff's mother, Frances Brew:

Frances Brew: Dr. Ferraro recommended us. Recommended that we go.

[Defendants' Counsel]: For what purpose?

A: To see Dr. Leadbetter again.

Q: And did you meet with Dr. Leadbetter again?

A: Yes.

Q: Did you meet with him prior to his performing this surgery?

A: Yes.

Q: How many times did you meet with him prior to the surgery?

A: Once I think.

Q: And how long was that meeting.

A: Brief.

Q: Do you have an approximate time?

A: No, I don't. I'd again be guessing.

Q: And would you tell me what you recall about the discussions during that meeting. Was it just you and Dr. Leadbetter, or was your husband present?

A: No, my husband was not present.

Q: Just you and Dr. Leadbetter?

A: Just Dr. Leadbetter and me. He drew me a diagram and kind of explained, or tried to explain what he was planning; you know, that he thought this could help her. And he said he was going to reimplant her uterus [sic]. And that's about all I remember.

24

A:    He drew you a diagram to describe the operation.

Q:    Yes.

A:    Do you remember any discussion about lengthening of the urethra?

A:    No.

Q:    Do you remember any discussion and do you remember him showing that in the course of his diagram [sic]?

[Plaintiff's Counsel]:  The "that" being the lengthening of the urethra?

A:    No, I don't.

Q:    Is it possible that he did that but you just don't recall?

A:    Well, anything's possible.

Q:    Did you sign a consent form for the operation that Dr. Leadbetter performed?

A:    Yes.

Dep. of Frances Brew, Vol. 1, at 127-28. In support of their contention that the plaintiff's mother consented to the specific procedure Leadbetter performed, the defendants rely on the plaintiff's mother's deposition as follows:

[Defendants' Counsel]:  Is it your position that Dr. Leadbetter did not have your consent to perform the procedure he performed on [the plaintiff]?

Frances Brew:  No.

Id. at 130. The plaintiff points to other portions of the deposition to establish that the plaintiff's mother in actuality

25

was not told and did not understand what procedure Leadbetter was performing and to establish that she therefore could not have consented to the procedure that Leadbetter did perform:

[Defendants' Counsel]:  I take it that he explained to you that he could do a surgery that would make Mary's urethra longer?

[Plaintiff's Counsel]:  Objection.

A:    I don't know that he used those exact words.

Q:    Do you have any memory of what exact words he used?

A:    No, I don't.

Q:    Did you get the sense from what he was telling you that he was going to do some sort of rebuilding or restructuring of [the plaintiff's] urethra?

A:    That he was going to do some sort of restructuring, but I don't know that he mentioned the word urethra.

Q:    That he was going to so some restructuring in her bladder?

A:    Or in the area.

.  .  .  .

Q:    What did you understand the operation was at the time of the operation?

A:    At the time I thought he was, was working on her original – her congenital problem, which was the bladder neck obstruction, and that somehow, you know, was going to, you know, make it successful.

Q:    Make what successful?

A:    The surgery.  The first surgery.

Q:  I thought you had testified earlier that you
    understood it was a reconstruction.

[Plaintiff's Counsel]:  That the Leadbetter procedure?

[Defendants' Counsel]:  Yes.

A:  Of the bladder neck.

Q:  Okay.

A:  Okay.

Q:  Is it your testimony that you thought it was the
    same surgery –

A:  Yes.

Q:  – that Dr. Ferraro was performing?

A:  No, not the same surgery.

Q:  How was it different, did you understand, at the
    time of the operation?

A:  That it was – that he was still working on the
    same problem.  That she still had the same
    problem.  An obstruction.  And that he was going
    to try to see if he could fix it.  Dr. Leadbetter.

Q:  And what was the reconstruction element of the
    surgery that you understood?

[Plaintiff's Counsel]:  Objection.

Q:  At the time.

[Defendants' Counsel]: She testified earlier that she
understood that part of the procedure was a
reconstruction.

[Plaintiff's Counsel]:  And then she testified that it
was a reconstruction of the bladder neck.  And now
you're asking what is her understanding of the
reconstruction element?

27

[Defendants' Counsel]:  I don't think she testified to that.

Q:    You understood it was a reconstruction of the bladder neck?

A:    Yes.

Dep. of Frances Brew, vol. 1, 31, 114-16.

The plaintiff has cast count five solely as a medical battery claim.  From the deposition above, the court finds that it is apparent that the plaintiff's mother understood that Leadbetter was going to be performing reconstructive surgery on the bladder area or the bladder neck, despite the fact that the exact word urethra was not used.  Although the transcript reveals that the plaintiff's mother may have failed to understand the underlying reason why Leadbetter was performing the procedure, and also may have failed to understand the physiological distinctions between the bladder area, the bladder neck, and the urethra, it is evident that she grasped the general procedure that Leadbetter intended to and did perform, and that she consented to it.[9]  Therefore, the court finds that there is no material fact at issue in regards to the medical battery claim against Leadbetter, and grants summary judgment on this count.

_____

[9]The court finds it significant that at the deposition the plaintiff's mother maintained her position that she had consented to the procedure Leadbetter performed.

F.   Malpractice in the Diagnosis and Determination of Treatment: Leadbetter

The plaintiff alleges that in the alternative, to the extent that Leadbetter performed the reconstructive procedure on the plaintiff when it was unnecessary, his diagnosis and course of treatment failed to meet the appropriate standard of care.  The defendants assert that this claim is precluded by the two-year statute of limitations.  This cause of action arose in 1964 when Leadbetter diagnosed and performed surgery on the plaintiff but did not accrue until 1990.  For the reasons discussed supra, the court finds that the six-year statute of limitations applies to this count and it is not time-barred.

G.   Intentional Infliction of Emotional Distress: Ferraro and Leadbetter

In count seven, the plaintiff asserts that Ferraro and Leadbetter are liable for the intentional infliction of emotional distress against both Ferraro and Leadbetter.  The tort of intentional infliction of emotional distress is recognized in New Hampshire:

> One who by extreme and outrageous conduct intentionally
> or recklessly causes severe emotional distress to
> another is subject to liability for such emotional
> distress, and if bodily harm to the other results from
> it, for such bodily harm.

Morancy v. Morancy, 134 N.H. 493, 496, 593 A.2d 1158, 1159 (1991)

29

(quoting <u>Restatement (Second) of Torts</u> § 46 (1965)).  The

defendants are liable

> only where the conduct has been so outrageous in
> character, and so extreme in degree, as to go beyond
> all possible bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civilized
> community.  Generally, the case is one in which the
> recitation of the facts to an average member of the
> community would arouse his resentment against the
> actor, and lead him to exclaim, "Outrageous!"

<u>Restatement (Second) of Torts</u> § 46, cmt. d.  Initially, it is for

the court and not the jury to determine whether the defendants'

conduct was so "extreme and outrageous" that liability may lie.

See <u>id.</u>, cmt. h.

The plaintiff asserts that defendants Ferraro and Leadbetter

are liable for the intentional infliction of emotional distress

because they:  (1) failed to disclose to the plaintiff or her

parents her true medical condition; (2) actively concealed her

true medical condition; and (3) allowed the plaintiff to discover

her true medical condition in a public library.  The defendant

asserts that summary judgment is warranted because the

defendants' conduct was not extreme and outrageous.[10]  On the

_____

[10]The defendants also argue that both the intentional
infliction of emotional distress claim and the negligent
infliction of emotional distress claim in count eight are barred
by the statute of limitations.  They assert that the causes of
action arose in 1963 and 1964 and are therefore governed by the
two-year statute of limitations.  However, as discussed earlier,
because neither claim accrued until at least 1990 the six-year

claim against Ferraro, the defendants assert that summary judgment is warranted because: (1) there is no allegation or evidence that Ferraro affirmatively misrepresented to the plaintiff or her parents the nature and cause of her incontinence; (2) all of Ferraro's actions were based upon then-current medical theory; (3) Ferraro referred the plaintiff to Leadbetter when the problem persisted; and (4) even if Ferraro had formed the opinion that his operation had caused the plaintiff's incontinence and did not communicate this to the plaintiffs, such conduct is not extreme or outrageous. On the claim against Leadbetter, the defendants assert that summary judgment is warranted because: (1) Leadbetter first saw the plaintiff after the Y-V plasty; (2) the procedure he performed was the most advanced then available; (3) the cause of the plaintiff's incontinence was irrelevant to his efforts to solve her problems; (4) there is no allegation that Leadbetter affirmatively misrepresented the etiology of the plaintiff's incontinence to the plaintiff or her parents; and (5) even if Leadbetter had formed the opinion that Ferraro's operation had caused the plaintiff's incontinence and did not communicate this

---

statute of limitations is applicable.

31

to the plaintiffs, such conduct is not extreme or outrageous.[11]

In this case, the plaintiff's permanent incontinence was allegedly caused by the malpractice of Ferraro's Y-V plasty, which apparently severed critical nerves and muscles in the plaintiff's bladder neck and/or urethra. This iatrogenic injury in turn caused the plaintiff to become permanently incontinent, necessitating further treatment. The plaintiff was confronted with a number of options, including additional surgery and drug therapy. The plaintiff's true medical condition was never disclosed to her. As a result, among other things, she was unable to adequately evaluate the options presented to her, or to understand what was happening to her. The plaintiff then elected to undergo a second surgery, uninformed about why the surgery was necessary or what its specific ultimate result would be. Unbeknownst to the plaintiff, this second surgery was

_____

[11]The plaintiff responds only to the legal arguments asserted by the defendants, stating that she understands the defendants are not making a factual challenge to the claims in count seven. The court finds the defendants' motion challenging the factual sufficiency of count seven as to the affirmative misrepresentations of Ferraro clear: "There is no allegation or evidence that Dr. Ferraro affirmatively misrepresented to the plaintiff or her parents the nature and cause of her incontinence." See Defs.' Mot. for Summ. J. at 23. However, because the court can determine the viability of count seven without deciding the issue of Ferraro's alleged misrepresentations, the court will address the defendants' challenge to count seven without addressing the misrepresentations.

32

experimental.

As the incontinence persisted, so too did her treatment. However, without having been appraised of her true medical condition or her physiological state, the continuing treatments, including catheterizations, were unnecessarily and extra-ordinarily painful. Possible alternatives were not explored. Ultimately the plaintiff was left to discover and understand her medical history and physiological condition almost thirty years later through information relayed to her by other doctors and through her own research. Finally, she came to the realization that her condition was most likely the product of the initial Y-V plasty, that she participated in an experimental surgery that was unsuccessful, that her treating doctors failed to explain her medical condition and her physiology to her, that they allowed her to continue to misapprehend her condition, that as a result subsequent care provided her was unnecessarily painful and injurious to her, including her catheterizations, that other options available may not have been fully appreciated or understood, and that she now faces the probability of a urinary diversion. The court finds that these allegations meet the "extreme and outrageous" standard and are sufficient to state a claim for the intentional infliction of emotional distress.

33

H.    Respondeat Superior Liability of Concord Urology

The plaintiff asserts that Concord Urology is liable under a theory of respondeat superior for those acts of Ferraro which occurred while Ferraro was under its employ.  The defendants assert that Concord Urology could not be liable because Ferraro was not an employee of Concord Urology at the time the causes of action arose.

Pursuant to the doctrine of respondeat superior under New Hampshire law, "an employer may be held vicariously responsible for the tortious acts of an employee committed incidental to or during the scope of employment."  Trahan-Larouche v. Lockheed Sanders, 139 N.H. 483, 485, 657 A.2d 417, 419 (1995).  To the extent that Ferraro committed tortious acts while treating the plaintiff, and those acts were within the scope of Ferraro's employment by Concord Urology, the acts provide a basis for Concord Urology's liability on a theory of respondeat superior.

The record indicates that the plaintiff continued to see Ferraro until 1980.  See Defs.' App. at 54.  The plaintiff's medical notes dated May 15, 1980, and August 14, 1980, taken by Ferraro, are on printed stationary that state at their head "CONCORD UROLOGY Professional Association" and "case record." Id.  Therefore, while in the employ of Concord Urology, Ferraro saw, diagnosed, and treated the plaintiff.  As recounted above,

34

the plaintiff assert that Ferraro is liable because he: (1) failed to disclose information to the plaintiff regarding the relationship between her two operations and her medical condition after the operations; and (2) failed to provide adequate post operative care. These failures allegedly resulted in both the plaintiff's inability to adequately review her medical options and medical treatment that was injurious to her and unnecessarily painful. Moreover, these acts, among others, form the predicate for the plaintiff's claims of intentional and negligent infliction of emotional distress. To the extent that Ferraro committed these acts while in the employ of Concord Urology, whether these acts constituted a continuing tort by Ferraro or independent torts separate from prior tortious acts, the acts alleged are tortious and allow a claim against Concord Urology under a theory of respondeat superior. The court therefore rejects the defendants' motion for summary judgment on this count.

<u>Conclusion</u>

For the reasons stated above, the court grants the defendants' motion for summary judgment (document no. 38) as to

count 5, alleging medical battery against Leadbetter, and denies it as to the other counts.

SO ORDERED.

                                                              _____
                                                              Joseph A. DiClerico, Jr.
                                                              District Judge

July 28, 1998

cc:  Robert A. Backus, Esquire
      John Traficonte, Esquire
      Michael R. Callahan, Esquire
      John E. Friberg, Esquire
      Ronald L. Snow, Esquire
      William D. Pandolph, Esquire

36